# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANG N. RATMYSENG, | CASE NO. 1:07-cv-01742-SMS |
| Plaintiff, | |
| | ORDER RE PLAINTIFF'S |
| v. | SOCIAL SECURITY COMPLAINT |
| COMMISSIONER OF SOCIAL SECURITY, | |
| | (Doc. 36) |
| Defendant. | |
| _____/ | |

　　　　Plaintiff Nang N. Ratmyseng seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for child's supplemental security income  ("SSI"), pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act").  The matter is currently before the court on Plaintiff's motion for summary judgment and the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1]  Following a review of the complete record, this Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based on proper legal standards.  Accordingly, this Court denies Plaintiff's appeal.

*///*

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge.  On March 14, 2008, the Honorable Oliver W. Wanger reassigned the case to Judge Snyder for all purposes.

# I. Administrative Record

## A. Procedural History

On March 12, 2004, Plaintiff's mother, Thep Ratmyseng, applied on Plaintiff's behalf for child's SSI benefits under the Act, alleging disability due to schizophrenia and paranoia. AR 11, 67. She alleged that Plaintiff was unable to concentrate in school, removed her clothing and exhibited her genitalia to others, self-mutilated, broke and kicked things, and threatened to hurt her mother. AR 68-69, 78. Plaintiff's disability allegedly began June 1, 2002. AR 57.

After the claim was denied administratively and upon reconsideration, Plaintiff requested a hearing before an ALJ. AR 48-49. After a hearing, the ALJ denied Plaintiff's application on November 6, 2006. AR 8-20. Plaintiff moved for review on December 29, 2006. AR 7. On September 27, 2007, the Appeals Council denied Plaintiff's request for a review of the ALJ's decision and declared the ALJ's decision the final decision in this action. AR 4-6. Plaintiff filed her complaint, seeking judicial review, on November 29, 2007. Doc. 2.

## B. Factual Record

In the earliest evidentiary document in this case, the California juvenile court ordered Plaintiff removed from her home in an order dated December 8, 2003. AR 92-99. According to the order, police officers had removed Plaintiff from her Fresno home on February 6, 2003, after she assaulted her mother in the course of an argument arising from Plaintiff's refusal to remove jewelry from her chin piercing. AR 93. Plaintiff was initially placed in a group home, from which she eloped; then detained in juvenile hall; then placed in a second group home. AR 94. On April 19, 2003, Plaintiff was taken to the Psychiatric Assessment Center for Treatment ("PACT") after she began to drool, experienced difficulty breathing, and told voices in her head to shut up. AR 94. She was transferred to Heritage Oaks Hospital in Sacramento until May 6, 2003, when she was returned to juvenile hall in Fresno. AR 94.

On June 5, 2003, Plaintiff was placed in a third group home. AR 94. After she cut her wrists on July 12, 2003, Plaintiff was taken to a hospital for stitches, then transferred to PACT. AR 94. Thereafter, the group home determined that it could no longer serve her, and she was returned to juvenile hall for violation of probation. AR 94.

On August 20, 2003, Plaintiff was placed in a fourth group home, from which she eloped on August 21, 2003. AR 94. She was arrested and returned to juvenile hall on September 3, 2003, where she was detained until December, when the court issued its order. AR 94-95.

In its December 2003 order, the juvenile court found that Plaintiff had not remained in any of the group homes long enough to receive therapy and counseling. AR 95. Her behavior was unsatisfactory until her fall detention in juvenile hall, where she was doing well. AR 95. She was also doing well at Ashjian Treatment Center school. AR 95.

The juvenile court recommended that, until its next review in June 2004,[2] Plaintiff be placed in a group home able to provide appropriate services. AR 96-97. The court's detailed Placement Needs Assessment and Case Plan is reproduced at AR 100-108. Objectives included family reunification, elimination of Plaintiff's drug and alcohol dependency, academic improvement, anger management, and self-control. AR 102-105.

Medical and counseling records from Plaintiff's stay at juvenile hall document her anger, defiance, and manipulative personality, and her intermittent compliance in taking her medications. AR 111-137. Following an initial psychiatric evaluation on June 17, 2003, Dr. Leticia Chua reported that Plaintiff was depressed and angry, had auditory and visual hallucinations, and had previously considered suicide and cut herself. AR 128-132. On July 26, 2003, psychiatrist Emanuel Fantone reported that Plaintiff was suicidal and initially refused medications, but later consented to certain medications. AR 125. On August 16, 2003, Plaintiff told Fantone that she was hearing voices. AR 124. On September 20, 2003, Dr. Fantone found no psychosis, but diagnosed recurrent depression and conduct disorder. AR122.

Plaintiff cut her wrist on October 28, 2003, and threatened to do so again on October 30, 2003, if her mother did not visit her. AR 116, 118. On November 29, 2003, Dr. Fantone reported that Plaintiff was intermittently compliant with medications of Risperdol and

---

[2] No further orders or reports of the juvenile court are included within the record of Plaintiff's SSI application.

Wellbutrin,[3] and that she reported hearing voices arguing. AR 114. He diagnosed paranoid schizophrenia and recurrent depression in remission. AR 114. On December 27, 2003, Fantone reported that Plaintiff was compliant in taking medications and was feeling better and not experiencing delusions. AR 113.

According to the February 9, 2004 report of Dr. Fernandez of Fresno County Human Services System, Plaintiff was released from juvenile hall on January 26, 2004. AR 111. She was to begin ninth grade at McClain High School. AR 111. Fernandez updated Plaintiff's diagnosis to include bipolar disorder. AR 111. By May 2004, Plaintiff was back home on a trial basis. AR144.

On May 5, 2004, Fresno police removed Plaintiff from her home after she broke a window and repeatedly cut herself using the glass. AR 140, 144, 153. Plaintiff was angry at her mother, who had reported to a social worker that Plaintiff was not attending school. AR 144, 155. Plaintiff's mother also reported that Plaintiff was noncompliant with medication and refused to attend therapy. AR 156. Plaintiff was discharged to juvenile hall and directed to secure continued mental health treatment. AR 139, 144.

Plaintiff began seeing Dr. Mohini Shukla on September 16, 2004. AR 177-179. In her initial appointment, Plaintiff denied depression, hallucinations, delusions and thought disorders. AR 177-178. Noting that Plaintiff was attending Community Day School but sleeping in class and doing no work, Shukla described her as "passively defiant" and predicted that she was unlikely to take her medications as prescribed. AR 178. On October 13, 2004, Plaintiff told Shukla that she had previously lied about hallucinating. AR 176. As a result, in a reports dated October 21, and November 16, 2004, Shukla questioned the diagnosis of schizophrenia. AR 173. Shukla diagnosed Plaintiff as having unstable ADHD (attention deficit hyperactivity disorder) and a conduct disorder. AR173. As treatment progressed, Shukla reported less hyperactivity, and Plaintiff's becoming more manageable and less argumentative. AR 174.

---

[3] Risperdal® is an antipsychotic drug used for treatment of schizophrenia in adults and adolescents. *Physicians' Desk Reference* at 2593, 2682 (64th ed. 2010). Wellbutrin® is an antidepressant. *Physicians' Desk Reference* at 1719 (64th ed. 2010).

In a Childhood Disability Evaluation Form (SSA-538-F6) prepared on behalf of Plaintiff on October 18, 2004, Dr. Evelyn Aquino-Caro identified Plaintiff as having a mental problem but concluded that current medical evidence was not sufficient to support a finding of a disability. AR181-189.

By November 16, 2004, Plaintiff reported continuing inability to focus and complete class work, although her medication made her feel better. AR 173. She denied hallucinations, delusions, and suicidal or homicidal thoughts. AR 173. Shukla noted that Plaintiff "interacted in a friendly and appropriate manner." AR 173.

From approximately December 16, 2004, through December 22, 2005, Plaintiff received medications, and participated in individual therapy as well as family therapy with her mother and sister Sing Sing through Fresno County Mental Health. AR 199-565. (By then, Plaintiff was again living at home with her mother and Sing Sing.) Progress notes from this period indicate that, with significant support from social service workers and agencies, Plaintiff and her family made progress on communication and mutual respect. Plaintiff herself progressed on developing self-control, particularly with regard to angry responses to her mother, and on developing self esteem. Treatment focused not only on Plaintiff's issues, but on those of Plaintiff's mother, who was also on probation and addressing drug and alcohol issues. The agency's records indicate that the family was to continue to receive necessary services from other sources following Plaintiff's release from probation, which occurred on October 27, 2005. AR 231.

Shortly after therapy had begun at Fresno County Mental Health, on January 18, 2005, Dr. Evangeline Murillo completed the second Childhood Disability Evaluation Form (SSA-538-F6). AR190. Murillo noted that Plaintiff's records were discontinuous, but that current reports indicated that Plaintiff's condition was improving. AR 198. A November 16, 2004, progress note indicated that Plaintiff was doing well in school and at home. AR 192. Her behavior was friendly and socially appropriate. AR 192. Finding that Plaintiff's claims were credible for condition but not for severity, Murillo concluded that Plaintiff's disability was not expected to continue more than 12 continuous months. AR 190; AR 198.

///

The October 7, 2005 evaluation of Dr. Brar[4] (AR 207-210) of the Fresno County Mental Health Department, reported:

> 15 yr old female with complicated diagnosis. Patient with history of chaotic upbringing, unstable life style, multiple juvenile hall visits. At one point patient was diagnosed with schizophrenia. Patient reported that in reality she never heard voices, she lied about it to get out of juvenile group homes. She regrets saying it. She reports no signs of psychosis. No objective evidence of psychosis. [*illegible*] Patient initially defiant, irritable, then requests Mom to leave. She talks with doctor/counselor at ease. She reports feeling depressed since breakup with her boyfriend approximately two weeks ago. She reports long history of low mood, denies history of [*illegible*]. She reports history of making suicide threats but denies having plan or intent to act on those threats. She denies [*illegible*] plan or intent. She has history of conduct problems, ie, fighting, stealing, destroying property, staying out late at night, truancy from school. Mom reports that patient thinks she is [*illegible*]. She has poor sleep, does not get along with anyone, problems with school, history of assaultive behavior, blaming mother. Mom reports that patient has made threats to kill herself and mom in past. She reported patient makes these threats when she does not get her way.

AR 207.[5]

Brar noted that Plaintiff was depressed and irritable, but showed no psychotic phenomena, delusions, hallucinations, command hallucinations, obsessions or compulsions, or suicidal or homicidal ideation or plan. AR 209. He reported that Plaintiff acted angry around her mother, but was fine with the counselor alone. AR 209.

### C. Hearing Testimony

The hearing was held on August 15, 2006, when Plaintiff (born December 7, 1989) was sixteen years old. AR 566-602. Plaintiff testified that, because she did not get along with her mother, she was then living with her grandfather and step-grandmother, into whose home she had moved two years earlier. AR 571, 573, 595.[6] She had not been on probation since 2005. AR 574. Plaintiff still saw her mother nearly every day to eat and talk, rent movies, and go shopping. AR 576.

///

---

[4] The record occasionally refers to Dr. Brar as Dr. Barr. This decision consistently uses "Brar."

[5] In transcribing Brar's report, the court has converted his abbreviations and symbols to complete words.

[6] The point at which Plaintiff moved into her grandfather's home is unclear. On April 7, 2005, following an argument with her mother, counselors moved Plaintiff to her grandfather's home overnight to permit de-escalation. AR 460. Later counselors' reports reflect Plaintiff living at home with mother and Sing Sing.

Plaintiff was reluctant to testify about interactions with her counselor, describing them as "embarrassing." AR 577. She reported that she sometimes got along with her counselor, with whom she discussed family problems. AR 578. Plaintiff refused to testify further regarding the nature of her counseling. AR 578. Plaintiff testified that she saw her doctor only when she needed to arrange for refills of her medications, Risperdal® and Effexor®.[7] AR 579-580. Although the doctor repeatedly offered her further counseling, Plaintiff stated that she did not need it. AR 579-580.

According to Plaintiff, her medication calmed her down. AR 581. She liked that it helped her lose weight, but not that it induced sleepiness. AR 582, 583, 584. Plaintiff took her medication, which was to be taken daily, only three or four times weekly. AR 583. As with her household chores, declared Plaintiff, she did things only when she wanted to. AR 585.

Later in August 2006, Plaintiff looked forward to beginning her fourth year of high school at McClain, attending the tenth grade. AR 572, 590. The previous year, Plaintiff had studied at home, completing two credits. AR 573.

Plaintiff claimed that she liked to cook, especially noodles and Asian food, but could not say whether anyone liked her cooking. AR 586. She testified that she and her friends liked to hang out, watch movies, walk around, and "beat up other kids," although she immediately disclaimed that they beat others, saying she was "just playing." AR 587. Plaintiff described herself as the "class clown," who "like[d] to laugh and act stupid with people" and "make fun of people." AR 589. The testimony continued:

Q       (Plaintiff's attorney): Why do you do that?

A.      I don't know. I'm just – I'm that type of person. I'm not mean, but
        sometimes, I just like to make fun. Not make fun, like, hurt their feelings,
        but just, like, just make them laugh.

Q.      Does that make you feel better, too?

A.      It makes me happy, you know, to make somebody laugh.

Q.      Do you, do you get along with most of the people in school?

---

[7] Effexor® is an antidepressant drug prescribed for major depression and anxiety. *Physicians' Desk Reference* at 3504-05 (64th ed. 2010).

A.    No. Sometimes, if, if either I don't say nothing stupid, usually, they say something stupid, I get pissed the fuck off.

Q.    What, what happens when you get mad?

A.    I don't know.  I usually – we usually end up fighting.

Q.    Why, why do you do that?  Why do you end up in a fight?

A.    It's just – it's the type of – I don't, I don't, I don't like taking no bullshit off – I don't like – oh, I'm sorry for cussing.  I don't like taking any crap from other people.  I'm that type of person.

AR 589-590.

Plaintiff's attorney tried again later:

Q.    Now when you get mad, you said because you don't like to take anything from anybody you're not nice to, but –

A.    Not nice.  It's just like, I just – if they say something stupid, or something like that.  When they say for instance, if I was walking with my grandpa taking him to the store, because I don't, I don't like to see him, because he can't really walk.  So I take him, like, to Bingo, you know, the store by my house, the Asian store.

Q.    Uh-huh.

A.    And like, let's say, for instance, I don't say people do that, but let's say, for instance, somebody just came up, you know, like, "Oh, MF – oh, why are you with that old man?"  I will beat the living crap out of them.  That's, that's how I am.

AR 591.

Plaintiff testified that, if someone upset her, she would "just swing" in response, because she "was brought up like that."[8]  AR 592.  In response to the ALJ's questions regarding further interactions with law enforcement since her 2005 release from probation, Plaintiff replied, "I haven't gotten caught yet . . . . ." AR 591.  When asked which family member disciplined her, Plaintiff replied, "I don't listen to anyone.  I don't like listening to anyone." AR587-588.  She claimed that she had "nobody telling [her] what to do" and that she "didn't really love anybody, but I love my grandpa the most." AR 588.

---

[8]  The record suggests that this testimony may have simply been truthful.  The record includes multiple references to violence in Plaintiff's home, including Plaintiff's repeatedly witnessing her mother being assaulted by various paramours, and Plaintiff's having been sexually assaulted by one of the paramours. *See, e.g.*, AR 209, AR 241.

Using an interpreter, Plaintiff's grandfather, Hao Ratmyseng, testified that he had "no ability to tell her what to do." AR 596. She did not cook in his home. AR 596. She did not go to bed when directed to and frequently stayed out all night. AR 597. Because Plaintiff would not listen to anybody, she had been in further trouble with the police. AR 598. She was frequently angry and would not take her medications. AR 598. He denied, however, that Plaintiff was physically violent. AR 599.

## II. Discussion

### A. Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

### B. Legal Standards

For new claims filed on or after August 22, 1996, the Personal Responsibility and Work Opportunity Act of 1996 sets forth the applicable childhood disability standard. *Pub. L. No. 104-193, § 211, 110 Stat. 2105 (1996),* amending 42 U.S.C. § 1382c(a)(3)(A). The statute provides:

[A]n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked or severe functional limitations, and which can be expected to

9

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i).

To apply the statutory standard, the Commissioner uses a three-step sequential evaluation to determine whether a child's impairments result in marked and severe functional limitations satisfying the statutory definition of "disabled." 20 C.F.R. § 416.924(b)-(d)(2009).

The relevant inquiry at step one is whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). If not, step two requires the fact finder to determine whether the child has a medically severe impairment or combination of impairments. 20 C.F.R. § 416.924(c). If the impairment is a "slight abnormality or a combination of slight abnormalities that cause no more than a minimal functional limitation," the Commissioner must find that the child does not have a severe impairment and therefore is not disabled. 20 C.F.R. § 416.924(c).

Here, the ALJ first determined that Plaintiff "had not engaged in substantial gainful activity at any time relevant to this decision." AR 14. He then determined, based on the report of Dr. Brar (AR 207-210), that Plaintiff had several severe impairments: "a mood disorder, not otherwise specified, a conduct disorder, and alcohol and marijuana abuse." AR 14.

Substantial evidence, derived both from Dr. Brar's report and from the record as a whole supports this determination. Documentation of Plaintiff's depression appears, among other places, at AR 111, AR 122, AR 125, AR 128-132, AR 207, and AR 209. Alcohol and substance abuse is discussed at AR 102-105. References to Plaintiff's conduct disorder occur at AR 93-94, AR 102-105, AR 111-137, AR 140, AR 144, AR 155-156, AR 173-174, AR 178, AR 207, AR 209, AR 571, AR 573, AR 595, AR 589-592, and AR 596-598.

Step three requires determining whether the severe impairment meets or equals in severity any impairment that is listed in 20 C.F.R. Part 404, Subpart P. Appendix 1. 20 C.F.R. § 416.924(d). If such an impairment exists, the Commissioner must find the child disabled. *Id.* The ALJ concluded that the facts in the record did not meet or equal the severity of the impairments most like those established for plaintiff. AR 14.

///

If the child's impairment does not meet or medically equal any listing, then the Commissioner must determine if the limitations caused by the impairment functionally equal a listing in the Listing of Impairments. *Id.* To do so, the Commissioner must assess all of the functional limitations caused by the child's impairments in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for self; and (6) health and physical well being. *See* 20 C.F.R. § 416.926a(a). The ALJ did so here, making the findings and conclusions set forth below. In her appeal to this court, Plaintiff challenges the ALJ's findings about her impairments as "superficial," and not supported by substantial evidence.

1.  **Acquiring and using information:** "This domain considers how well the claimant is able to acquire and learn information, and how well the claimant uses the information she has learned (20 C.F.R. § 416.926a(g))." AR 16. Limited functioning in this domain may be indicated by a child who does not understand simple words relating to space size or time; cannot rhyme or relate to word sounds, cannot recall things learned recently, difficulty calculating or solving mathematical questions, and inability to speak or explain what she means (20 C.F.R. §416.926a(g)(3). AR 16. Finding that the November 16, 2004, progress note reported that Plaintiff was "doing well at the group home and at school" and that she was taking her medication, the ALJ concluded that Plaintiff's limitation in this domain was less than marked. AR 17.

    Nothing in the record suggested that Plaintiff had an intellectual disability. Indeed, Plaintiff was an articulate witness. Nonetheless, Plaintiff objects that the ALJ neither obtained Plaintiff's school records to verify the veracity of the progress note nor obtained for review Plaintiff's school records, intelligence tests or other cognitive testing.

    The claimant has the burden of proving disability (*Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996)) and of demonstrating a severe impairment. 20 C.F.R. § 416.924. *See also Salerno v. Astrue*, 266 Fed.Appx. 570, 572 (9th Cir.

2008); *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996).  The claimant's burden of proof includes both the existence of an impairment and the resulting limitations.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  In the case of a disabled child seeking SSI benefits, the initial burden includes establishing the level of the child's functioning.  20 C.F.R. § 416.912(c).

Plaintiff, who introduced no evidence of cognitive performance or cognitive evaluation, now argues that the ALJ erred in failing to request school records and results of intelligence and other cognitive testing.  Plaintiff's position is not supportable.  The burden of proof shifts to the Commissioner only when the claimant has made out a prima facie case of disability.  *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002).   Having failed to carry her initial burden of providing evidence that her disability resulted in marked limitations in acquiring and processing information, Plaintiff cannot now secure a second bite of the apple by charging that the ALJ failed to make her case for her.

2. **Attending and completing tasks:** "This domain considers how well the claimant is able to focus and maintain attention, and how well she is able to begin, carry through, and finish activities, including the pace at which she performs activities and the ease of changing activities (20 C.F.R. § 416.926a(h))."  AR 17.  A child with limited functioning in this domain will be easily startled, distracted, or unduly sensitive to sights, sounds, touch or movement; slow to focus or failing to complete activities of interest; repeatedly sidetracked or disruptive to others; easily frustrated with tasks even though she is capable of completing them; and needing extra supervision to remain engaged in an activity (20 C.F.R. 416.926a(h)(3)).  AR 17.

The ALJ concluded that, since Plaintiff was able to reach her individual therapy goals to meet the terms for release from probation, Plaintiff's limitations were less than marked.  AR 17.  In addition, Plaintiff testified that she had completed two credits through home study and anticipated returning to school for

12

the coming fall semester.  AR 572, AR 573, and AR 590.  See also AR 199-565, documenting Plaintiff's participation and progress in counseling.

3.  **Interacting and relating with others:** "This domain considers how well the claimant is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with the rules, respond to criticism, and respect and take care of the possessions of others (20 C.F.R. § 416.926a(i)).  AR 17.  The ALJ concluded that Plaintiff had a marked limitation in this domain.  He found that Plaintiff's ability to relate to her mother was so disturbed that she had moved to her grandparents' home.  She did not obey her grandfather.  Plaintiff had anger issues, fought with others, and was not receptive to directions from others.  Other people distracted her.  She did not trust others and has problems with old people. AR 18.

In short, Plaintiff's conduct disorder limits her ability to interact with and relate to others.  See AR 92-99 (Plaintiff removed from home following violent argument with mother regarding Plaintiff's refusal to remove jewelry from a chin piercing); AR 111-137 (providing examples of Plaintiff's anger, defiance, and manipulative personality); AR 116 & 118 (Plaintiff threatens to injure herself if mother does not come to visit her); AR 139-156 (Plaintiff breaks window and use the glass to self-mutilate after mother tells social worker that Plaintiff will not go to school); AR 199-565 (Plaintiff's treatment at Fresno County Mental Health focused on addressing family deficiencies and interactions); AR 207 (Plaintiff, defiant and irritable, refuses to speak candidly with Dr. Brar until mother leaves the room, reports conduct problems at school, uses suicide threats to manipulate others to comply with her wishes); AR 209 (Plaintiff angry at mother but interacts satisfactorily with doctor once mother leaves room); AR 571, 573 & 595 (Plaintiff testifies that she cannot get along with mother); AR 589-591 (Plaintiff testifies that she cannot control her interpersonal behavior and often ends up fighting when others say something she deems stupid, and that she will not take "bullshit" from

others); AR 592 (Plaintiff testifies that she acts aggressively as she was taught at home); AR 587-588 (Plaintiff admits that she will not listen to anybody); AR 588 (Plaintiff claims that she does not love anyone with the possible exception of her grandfather); and AR 596-AR 599(Grandfather testifies that Plaintiff does not obey and is angry).

4.    **Moving about and manipulating objects:** This domain examines a claimant's gross and fine motor skills (20 C.F.R. § 416.926a(j)).  AR 18.  The ALJ found that Plaintiff had no limitations in this domain.  AR 19.  Nothing in the record contradicts the ALJ's findings.

5.    **Caring for self:** This domain examines a claimant's ability to remain healthy, both emotionally and physically.  AR 19.  A claimant with limited functioning in this domain may place non-nutritive or inedible objects in her mouth, demonstrate emotional regression in self-soothing activities (such as thumb sucking), fail to dress or bathe appropriately for her age, engage in self-injurious behavior or ignore safety rules, fail spontaneously to pursue enjoyable activities or interests, or have disturbed eating or sleeping habits (20 C.F.R. § 416.926a(k)(3)).  AR 19. The ALJ concluded that Plaintiff had no marked limitation in her ability to care for herself.  AR 19.  Although the record documents instances in which Plaintiff cut herself or threatened suicide, the reports generally characterize these instances as manipulative acts, symptoms of Plaintiff's inability to interact with and relate to others. Plaintiff repeatedly denied suicidal intent.  Nothing in the record reports that Plaintiff exhibits regressive behavior.

To the contrary, Plaintiff testified that she was able to cook noodles and Asian food.  She assisted her elderly grandfather with shopping. She enjoyed shopping, eating, and watching movies with her mother.  Nothing suggested that she was unable to independently maintain personal hygiene or dress herself. Plaintiff was able to function independently, albeit in a manner that displeased her family (e.g., chin piercing, disobedience, staying out all night).  Simply put,

substantial evidence supported the ALJ's conclusion that Plaintiff was a defiant and undisciplined teen-ager, not a disabled person unable to care for herself.

6.  **Health and physical well-being:** This domain considers cumulative physical effects of physical and mental impairments that were not considered as part of the other domains (20 C.F.R. § 416.929a(1)). Limitations in this area include generalized symptoms of weakness, agitation, lethargy, dizziness or psychomotor retardation resulting from other impairments; somatic complaints related to other impairments such as seizures, headaches, incontinence, digestive problems, or insomnia; limitations resulting form treatment such as chelation, chemotherapy, multiple surgeries or similar medical procedures; exacerbations of an impairment that interfere with physical functioning; or medically fragility or a need for intensive care to maintain health (20 C.F.R. § 416.926a(l)(3)). AR 19-20. The ALJ concluded that Plaintiff has no limitations in health and well being. AR 20. Other than Plaintiff's claim that her medication made her sleepy (AR 582-584), no evidence indicates physical effects fitting this category. (Note that Dr. Shukla characterized Plaintiff's claim of sleepiness in the classroom as a symptom of her "passive defiance." AR 178.)

At this stage of our review, substantial evidence in the record established that the ALJ applied proper legal standards and that substantial legal evidence supported his findings. Accordingly, this Court's review, following the prescribed scope of review and applying the relevant legal standards indicates that it should affirm the determination below. Nonetheless, Plaintiff argues that the determination denying her SSI benefits should be reversed.

### C.   Plaintiff's Additional Objections on Appeal

In addition to her contention that the ALJ inadequately analyzed Plaintiff's limitations in the six domains set forth in 20 C.F.R. § 416.926a(a), which this Court addressed above, Plaintiff contends that the ALJ's determination should be reversed (1) for failure to include specific findings of credibility of Plaintiff, her mother, and her grandfather; and (2) for failure to articulate his reasons for not crediting the opinions of certain state medical agency and multiple

mental health practitioners. Plaintiff errs both because she misconstrued the ALJ's credibility statement, and because substantial evidence, including the testimony of Plaintiff and her grandfather, supported the ALJ's determination that her disabilities do not qualify her to receive SSI benefits.

### 1. Credibility of Plaintiff and her Family Members

The ALJ needed to make many credibility determinations in the course of reviewing the record, not the least of which was determining which of the various contradictory accounts and reports were believable, and which were not. Plaintiff contends that the ALJ erred because his analysis was "extremely superficial" and because he "never articulated specific reasons for not crediting the statements of Plaintiff, her grandfather or her mother regarding Plaintiff's limitations."

Plaintiff specifically objects to the ALJ's statement that,"After considering the ***evidence of record***, I find the medically determinable impairments could reasonably be expected to produce the alleged symptoms, ***but that the statements concerning the intensity, persistence and limiting effects of claimant's symptoms are not entirely credible.***" AR 15 (emphasis added). Although Plaintiff interprets this comment as an evaluation of the credibility of Plaintiff's and her grandfather's testimony, and of her mother's statements regarding Plaintiff's limitations, this court does not read it as such. The ALJ never indicated any intent to address the credibility of Plaintiff and her family members. And, as Plaintiff herself recognizes by arguing that the ALJ did not provide detail on the family members' lack of credibility, the ALJ did not address their credibility. Instead, his statement explicitly referred to the "evidence of record." AR 15.

In contrast, with regard to the hearing testimony of Plaintiff and her grandfather, the ALJ noted that "additional evidence has been received at the hearing level which shows the claimant's interacting and relating with others is more limiting than originally thought." AR 16. Thus, the ALJ appears implicitly to have recognized the shortcomings of Plaintiff's medical and psychological records while recognizing the value of the hearing testimony in illustrating the extent to which Plaintiff's interpersonal relationship skills are impaired. As this Court reads the

record, the ALJ did precisely what Plaintiff argues that he should have done, crediting the testimony of Plaintiff and her grandfather. The ALJ just did not reach the same conclusion as Plaintiff did.

Plaintiff would have had the ALJ accept the content of the family's statements at face value, but not recognize the nature and extent of Plaintiff's disability from the vivid display on the stand of her interpersonal limitations. The ALJ was not required to comply with Plaintiff's and her family's conclusion that Plaintiff was disabled. Credibility determinations are the sole province of the ALJ. *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995). When an ALJ has made specific findings, supported by substantial evidence in the record, justifying his or her determination to believe or disbelieve a claim, this court will not second-guess his or her decision. *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).

Examining Plaintiff's contention that the ALJ should have valued her mother's statements deserves separate attention. Because Plaintiff's mother did not testify at the hearing, her only "statements" appear in her application for SSI benefits and in the second-hand accounts of the various doctors, nurses, psychologists and social workers who treated Plaintiff.

In her SSI application on Plaintiff's behalf, Plaintiff's mother sought to establish a disability arising from schizophrenia or paranoia. Schizophrenia is defined as

a mental disorder . . . comprising most major psychotic disorders and characterized by disturbances in form and content of thought (loosening of associations, delusions, and hallucinations), mood (blunted, flattened or inappropriate affect), sense of self and relationship to the external world (loss of ego boundaries, dereistic thinking, and autistic withdrawal) and behavior (bizarre, apparently purposeless, and stereotypical activity or inactivity). The definition and clinical application of the concept of schizophrenia have varied greatly. The DSM-III-R criteria emphasize marked disorder of thought (delusions, hallucinations, or other thought disorder accompanied by disordered affect or behavior), deterioration from previous level of functioning, and chronicity (duration of more than 6 months), thus excluding from this classification conditions referred to by others as acute, borderline, simple, or latent schizophrenia. Originally called *dementia praecox* and characterized as a psychosis with adolescent onset and a chronic course ending in deterioration. The term schizophrenia was introduced by Bleuler because neither early onset nor

///
///

17

terminal deterioration is an essential feature; he emphasized the splitting and lack of personality integration seen in the disorder.

Dorland's Illustrated Medical Dictionary at 1492 (28th ed. 1994).

Paranoid schizophrenia is a type of schizophrenia characterized by preoccupation with one or more systematized delusions or with frequent auditory hallucinations related to a single theme. *Id.* The regulations provide that a child SSI applicant demonstrates schizophrenia or a similar psychotic disorder through "onset of psychotic features, characterized by a marked disturbance of thinking, feeling and behavior, with deterioration from a previous level of functioning or failure to achieve the expected level of social functioning." 20 C.F.R. Part 404, Subpart P. Appendix 1, § 112.03.

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
> A. Medically documented persistence, for at least 6 months, either continuous or intermittent, of one or more of the following:
> 1. Delusions or hallucinations; or
> 2. Catatonic, bizarre, or other grossly disorganized behavior; or
> 3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech; or
> 4. Flat, blunt, or inappropriate affect; or
> 5. Emotional withdrawal, apathy, or isolation;
> AND
> B. . . . . . [F]or children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. Part 404, Subpart P. Appendix 1, § 112.03.

Paragraph B2 of § 112.02 provides the following determinants of severity:

a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests . . .

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

///

Although early medical reports diagnosed schizophrenia based on Plaintiff's self-reports of hallucinations and an incident in which she appeared to be talking with voices in her head, several treating professionals questioned Plaintiff's earlier diagnosis of schizophrenia. That was because, by September 2004, Plaintiff repeatedly denied ever having had auditory hallucinations and told multiple mental health professionals that she had lied about hearing voices in order to escape the group home in which she then resided. Neither Plaintiff nor her grandfather testified to the issue of schizophrenia or other psychosis at the August 2006 hearing. Even when questioned by her own attorney, Plaintiff's testimony demonstrated her anger, violent attitude, defiance of authority, and refusal to take medications as prescribed, but revealed no disordered thought or splitting or lack of personal integration.

Plaintiff's grandfather, testifying through an interpreter, also emphasized Plaintiff's defiance, anger, and refusal to take her medication. He described no symptoms or behavior suggesting schizophrenia or other disability rooted in a splitting of personality, delusions, hallucinations, or disordered thought.

As a result, no substantial evidence supported a conclusion that Plaintiff had schizophrenia, much less that it resulted in Plaintiff's having marked or severe disabilities expected to last more than twelve months. But Plaintiff's appeal does not advocate a finding that she is disabled by schizophrenia, even though that was the nature of the application. Her poorly articulated argument seems to be that, in the absence of specific reasons for disagreeing with the family's conclusion that Plaintiff was disabled, the ALJ should have agreed, found Plaintiff to be disabled, and granted her SSI benefits. As previously noted, however, the ALJ based his findings and conclusions on substantial evidence in the record.

Federal courts have repeatedly recognized that "the prospect of receiving disability benefits based on an ailment whose extent if objectively unverifiable provides a strong incentive to falsify or exaggerate a claim." *Fair*, 885 F.2d at 602. "An ALJ cannot be required to believe every allegation . . . or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Id.* Since Social Security benefits are intended to benefit

///

people who are unable to work, benefits ought not be provided to those whose ailment results only in non-disabling symptoms. *Id.*

Although Plaintiff's family surely feels concern about her antisocial conduct, Plaintiff is not disabled within the meaning of the statutes and regulations governing SSI benefits. Because the ALJ's findings are supported by substantial evidence, including that derived from the testimony of Plaintiff and her grandfather, this court will not second-guess the ALJ's determination based on his credibility assessments.

## 2.    **Contradictory Medical Opinions**

In her third objection, Plaintiff contends that the ALJ erred by disregarding reports that would have supported a conclusion that Plaintiff was significantly more limited by her disability that the ALJ concluded. Specifically, Plaintiff contends that the ALJ should have disregarded Dr. Murillo's report (at AR 190) that the severity of Plaintiff's disability was exaggerated and was not expected to continue for more than twelve months (until fall 2005), and that he failed to consider medical reports indicating that her disability severely limited her functioning. In particular, Plaintiff contends that the ALJ should have recognized that, according to selected reports from fall 2005 (AR 201-205[9]), Plaintiff's condition was actually worsening. Plaintiff does not point out that Plaintiff experienced an emotional crisis and a temporary increase in depression in fall 2005 after her boyfriend left her. AR 248, 250, 255. Nor does Plaintiff address the ongoing therapy, of which her selected reports were a part, which indicated a general trend of improvement, despite periodic setbacks.

The four 2005 documents at AR 201-205 are a series of Progress Notes prepared by various professionals at Fresno County Mental Health. The isolated reports of individual appointments, two of which Plaintiff missed with no explanation recorded on the reports (AR 202, 204), offer no compelling reasons to disregard the ALJ's analysis of the record as a whole.

///

---

[9] The document at AR 203, which records prescription orders on October 21, and November 16, 2004, appears to have been chronologically misfiled. As a 2004 document, it is irrelevant to Plaintiff's arguments regarding her condition in Fall 2005.

On October 17, 2005, Nurse Practitioner Christie Clendenan recorded medication services. AR 205. Noting that Plaintiff was unwilling to talk with her, Clendenan recorded that Plaintiff was not taking her medications, stating "I don't give a shit." AR 205. Plaintiff reported that she was not sleeping and doing poorly in school. AR 205. Clendenan consulted with Dr. Alvarez, who countersigned the note, about the possibility of Plaintiff receiving wrap-around therapy from Families First. AR 205. Clendenan described Plaintiff as disheveled, uncooperative, drowsy, and irritable, but characterized Plaintiff's cognition, speech, language, thought processes, and thought content as normal. AR 205. The noted diagnoses were mood and conduct disorders. AR 205.

Plaintiff did not keep her October 25, or November 7, 2005 appointments. AR 204; AR 202.

Nurse Clendenan also prepared the December 8, 2005 note, reporting that Plaintiff took her medications only once in a while, not consistently. AR 201. Plaintiff agreed to try Prozac but refused therapy. AR 201. Plaintiff reported that she was depressed and failing her studies. AR 201. Plaintiff now reported that she was sleeping a lot. AR 201. Clendenan observed that Plaintiff was alert, well groomed, withdrawn, and depressed. AR 201. Her thought processes were organized. AR 201. Motor activity, cognition, speech, language, thought content, and affective range were normal. AR 201.

As Plaintiff contends, an ALJ must consider all medical evidence presented. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). "The medical opinion of a treating physician is entitled to special weight." *Fair*, 885 F.2d at 604; *Burkhart*, 856 F.2d at 1339; *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). This is because a treating physician has "a greater opportunity to know and observe the patient as an individual." *Smolen*, 80 F.3d at 1285. The Social Security Administrations rules favor a treating physician's opinion over those of nontreating physicians. 20 C.F.R. § 404.1527(d)(2). Nonetheless, a treating physician's opinion is not conclusive with regard to either the claimant's physical condition or the ultimate issue of disability. *Thomas*, 278 F.3d at 956.

This is especially true when Plaintiff urges the Court to set aside the agency's denial of her application based on the progress notes of only two appointments with a nurse practitioner.

"When there is conflicting medical evidence, the Secretary must determine credibility and resolve the conflict." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). An ALJ may disregard a treating physician's opinion that is premised on the claimant's own subjective complaints, particularly if the claimant's complaints have been rejected as incredible. *Tommasetti*, 533 F. 3d at 1041; *Fair*, 885 F.2d at 605; *Brawner v. Secretary of Health and Human Services*, 839 F.2d 432, 433-34 (9th Cir. 1988).

Plucking a few isolated reports from the Plaintiff's long-term individual and family therapy misrepresents that course of the therapy as a whole. As the ALJ found, a complete reading of the therapy records (AR 199-AR 565) indicates, despite period setbacks, an overall trend of improvement, culminating in Plaintiff's release from probation at the end of October 2005.

By necessity, measuring and treating Plaintiff's mood and conduct disorders relied largely on Plaintiff's self reports. Plaintiff undermined her own credibility in this regard by disclosing that she had feigned auditory hallucinations to be relocated from the group home in which she was housed to another location. The record is also replete with examples of Plaintiff's threatening suicide to manipulate others, particularly her mother, to give Plaintiff what she wanted. As a result, the ALJ had to look beyond Plaintiff's labeling of her symptoms and determine whether Plaintiff had a disorder and whether that disorder disabled her. The ALJ determined that Plaintiff had several impairments (a mood disorder, a conduct disorder, and drug or alcohol abuse), all of which found substantial support in Plaintiff's medical and counseling records

To qualify for benefits, a claimant must follow the treatment prescribed by his or her physician if the treatment would enable the claimant to work unless the claimant has an acceptable reason for noncompliance. 20 C.F.R. §§ 404.1530, 416.930; S.S.R. 02-1p at 2, 8-9; *Orn*, 495 F.3d at 636-37. As the ALJ observed Plaintiff's condition improved when she took her medication, but Plaintiff's compliance was spotty, at best (*see, e.g.*, AR 95, AR 113, AR 173, AR 174). Plaintiff also maintained that she did not need therapy. In the absence of an acceptable reason, Plaintiff cannot refuse medical and psychological assistance that has been shown to

///

ameliorate her disability, and demand that the degree of her disability be measured in her untreated condition.

D. **Conclusion**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

**Dated:     March 9, 2010**                           **/s/ Sandra M. Snyder**
                                            UNITED STATES MAGISTRATE JUDGE